Affirmed by published opinion. Judge THORNBURG wrote the majority opinion, in which Judge HALL joined. Judge WIDENER wrote a dissenting opinion.
OPINION
THORNBURG, District Judge:
Appellant, Salomon S. Loayza, assigns numerous errors to the court below in connection with his convictions for mail fraud in violation of 18 U.S.C. § 1341.
Loayza and co-defendant Robert Shirey owned or co-owned and operated several investment management companies. They devised a Ponzi-type scheme whereby individuals were persuaded -to invest in these companies by representations that their funds would be invested in reputable mutual funds guaranteed to earn tax-free interest and dividends.[1] The investors were also *-1316 assured the original principal investment ultimately would be returned in full. The money actually was used to pay the personal and business expenses of appellant and Shirey. Periodically, funds from new “investments” were used to make “interest payments” to the earlier investors. The availability of investment funds was assured by the use of the mail. Eleven investors were defrauded for a total of $628,000.
I.
Appellant’s first attack is on the bill of indictment. Prior to trial, he moved to dismiss the indictment as legally insufficient. The trial court denied the motion but ordered the government to file a bill of particulars.
Because appellant moved against the sufficiency of the indictment at trial, this court applies a de novo standard of review. United States v. Darby, 37 F.3d 1059, 1060 (4th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995). “[H]eightened scrutiny” is applied because the motion attacking the sufficiency was made prior to the verdict. Id., at 1063.
Appellant attacks the indictment primarily on the ground that the names and addresses of the victims were not included in each count. Counsel conceded at oral argument, however, that appellant was not prejudiced by the omission if the indictment is otherwise sufficient. He also claims it failed to give adequate notice of the charges because, while the counts refer to the amounts of the investment checks sent through the mail, the indictment does not state to whom they were payable, upon what banks drawn, the persons sending the check, the persons to whom sent, and the places of receipt.
In order to be legally sufficient, “[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense.” United States v. Daniels, 973 F.2d 272, 274 (4th Cir.1992), cert. denied, 506 U.S. 1086, 113 S.Ct. 1064, 122 L.Ed.2d 369 (1993). If the indictment does not contain every essential element of the offense, it is invalid; and, a bill of particulars cannot cure the defect. Darby, 37 F.3d at 1063; United States v. Price, 857 F.2d 234, 236 (4th Cir.1988) (citing Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). In essence, then, the bill of indictment insures that a defendant does not face incarceration “except on presentment or indictment of a grand jury;” thus, if it is insufficient, a prosecutor cannot cure the defects. Darby, supra; United States v. Floresca, 38 F.3d 706 (4th Cir.1994).
The essential elements of mail fraud are “(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme.” United States v. United Medical and Surgical Supply Corp., 989 F.2d 1390, 1404 (4th Cir.1993). The indictment here alleged that from March 1989 through December 1993, the appellant devised a scheme to defraud persons by inducing investments in specified investment management compames which he owned or co-owned. It also alleged intentional fraudulent representations by appellant as to future investments, interest rates, the return of original principal, the diversion of funds, and the cover-up of the scheme by partial “interest” payments. Eleven unidentified investors were alleged to have been defrauded for a total of $628,000. The checks used in the scheme were identified by the amount and as having been received through the mail on specified dates because of appellant’s representations. The essential elements of the charge thus are clearly specified.
Moreover, in order to obtain a conviction for mail fraud, the indictment must
“furnish the accused with such a description of the charge against him as well enable him to make his defence ... ”, [I]ndictments which do not identify specific mail fraud victims by name [are sufficient].
United States v. Mizyed, 927 F.2d 979, 981 (7th Cir.), cert. denied, 500 U.S. 937, 111 S.Ct. 2065, 114 L.Ed.2d 470 (1991) (citations omitted); accord, United States v. Hatch, 926 F.2d 387 (5th Cir.), cert. denied, 500 U.S. 943, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991) (an indictment for mail fraud is sufficient despite *-1315 he failure to identify the victim); accord, United States v. Arlen, 947 F.2d 139, 145 (5th Cir.1991), cert. denied, 503 U.S. 939, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992) (discussing a violation of 21 U.S.C. § 333) (“[t]he prosecution must prove beyond a reasonable doubt that a defendant intended to defraud or mislead someone, but the indictment need not specify the intended victim; the focus is on defendant’s intent, not the victim’s identity”). The indictment here was sufficiently specific. The time period, the scheme, the purported investment companies, the “coverup” of the diversion of funds, and the use of the mail to carry out the scheme are all alleged. Id. The identity of the fraud victims is not an essential element of the crime.
Nonetheless, the appellant is entitled to assurance that the indictment and prosecution were in fact for the same violations. In other words, upon what basis may it be determined that the grand jury returned a bill of indictment charging mail fraud of the same investors used by the prosecution to prove his case. Darby, supra; Floresca, supra.
The indictment’s preamble to Count One contains a detailed description of the scheme used by appellant to defraud investors, including the fact that appellant both solicited checks directly from the victims and also induced them to “liquidate their legitimate investment holdings and transfer the funds to the defendant and his companies.” JA.. at 13. The indictment also states that eleven investors were defrauded of a total of approximately $628,000. Id., at 14. Count One goes on to allege that on September 11, 1990, appellant received from the mail a cheek in the amount of $10,000 “which was mailed by an investor.” Id. Each of the remaining counts incorporates the preamble text to Count One. Count Two alleges that on April 8,1992, the appellant received in the mail a check in the amount of $10,000 which had also been mailed by an investor. Id., at 15. Likewise, Count Three specifies the receipt on June 4, 1991, of a cheek in the amount of $10,000 mailed by an investor. Id., at 15-16. The specification of the dates on which these checks were received by appellant, the amounts thereof, and the mailing thereof by investors assures that the grand jury, in returning charges on these counts, had in mind the investors who ultimately testified against appellant.
Such assurance is also certain as to Counts Four and Five. Those counts as well incorporate the preamble text to Count One. Count Four charges that on December 18, 1991, the appellant caused “to be delivered by mail according to the direction thereon, a check in the amount of $20,000.00, which was mailed by Keystone Fund to an investor solicited on the basis of the false and fraudulent statements and representations described” in the preamble text. J.A. at 16. When read together with paragraph 2 in Count One, it is clear that appellant induced the victim in Count Four to liquidate a legitimate investment in the Keystone Fund in order to place the investment with his companies and that he used the mail to do so. Count Five charges the same conduct, on a different date, involving a cheek in the amount of $5,000, again mailed by Keystone Fund to an investor for investment with appellant. As noted above, the specification of the dates, the amounts of the checks, and the identification of the legitimate investment company from which the checks were sent assures that the grand jury presented an indictment based on the investors who testified at trial.
While it is possible, as appellant argued, that he received large numbers of checks from various investors, the indictment’s identification of the dates, the cheek amounts and their receipt from investors or investment companies was sufficient to place him on notice of the charges. Appellant,
understandably, wants the government to disclose its theory of the case and the supporting evidentiary facts. “That is not and never has been required at the indictment stage.... The ready remedy of a motion for a bill of particulars[under Fed. R.Crim.P. 7(f) ] is available to add specifics beyond those required for the indictment to pass constitutional muster....” Here, the indictment “taken as a whole ... adequately apprised [appellant] of the charges so that [he] might prepare a defense.”
*-1314 Arlen, 947 F.2d at 145 n. 7 (citations omitted). Thus, the indictment informed the appellant of the charges and caused double jeopardy to attach for the purposes of any future prosecution. Daniels, 973 F.2d at 274.
It nonetheless bears noting that the addition of the victims’ identities could easily have been included in the indictment. Indeed, such a simple addition would have negated the motion to dismiss below and thus, a portion of this appeal.
II.
Appellant next claims the government engaged in prosecutorial misconduct. During closing argument, the prosecutor stated his belief that a certain government witness was telling the truth. J.A. at 290. Defense counsel’s contemporaneous objection was overruled. A prosecutor’s remarks where an objection has been raised are reviewed in their entirety for harmless error. Fed.R.Crim.P. 52(a). “Any error ... which does not affect substantial rights shall be disregarded.” Id.
Appellant also claims, for the first time on appeal, that other remarks of the prosecutor were improper. Where no objection was raised below, the remarks are reviewed for plain error. Fed.R.Crim.P. 52(b). “Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.” Id.
When the defendant has made a timely objection to an error and Rule 52(a) applies, the court of appeals normally engages in a specific analysis of the district court record — a so-called “harmless error” inquiry — to determine whether the error was prejudicial. Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.
United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (citations omitted). “Stated somewhat differently, had [appellant] preserved this issue for appeal, we would still be called upon to determine whether the government’s remarks were prejudicial in resolving whether the remarks constituted reversible error.” United States v. Moore, 11 F.3d 475, 481 (4th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 1864, 128 L.Ed.2d 486 (1994).
Considering first the prosecutor’s remark concerning the veracity of a witness, “[it is] improper for a prosecutor to directly express his opinion as to the veracity of a witness.” Moore, 11 F.3d at 481. Moreover, “[a]ny statement of personal belief jeopard-' izes the integrity of the trial process.” United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). Nonetheless, comments made by a prosecutor during - closing arguments will not warrant a new trial unless they “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” United States v. Francisco, 35 F.3d 116, 120 (4th Cir.1994), cert. denied, — U,S.—, 115 S.Ct. 950, 130 L.Ed.2d 893 (1995). In other words, were the remarks indeed improper and is it more likely than not that the remarks materially affected the appellant’s substantial rights. Id.; United States v. Bennett, 984 F.2d 597, 608 (4th Cir.), cert. denied, 508 U.S. 945, 113 S.Ct. 2428, 124 L.Ed.2d 649 (1993) (applying this test where counsel objected to the remarks).
The government concedes the comments here were improper. The issue then is whether those remarks materially affected the verdict. In resolving that issue, we consider first, whether the comments misled the jury and prejudiced the appellant; second, were they isolated or extensive; third, absent the remarks, what was the weight of the evidence against the accused; and fourth, were the prosecutor’s remarks deliberate. Moore, 11 F.3d at 482 (citing Olano, supra); see also Bennett, 984 F.2d at 608. The comment here was prejudicial but the trial court’s curative instruction prevented it from misleading the jury.[2] Francisco, *-1313 35 F.3d at 120 (“[W]e follow the presumption that the jury obeyed the district court’s limiting instructions.”). The remark was isolated and the evidence against appellant was overwhelming. Moreover, the remark clearly was not intentional since the prosecutor was not aware the word “I” had been used and when so advised, immediately apologized. J.A. at 334-35.
The prosecutor also stated during closing argument that the appellant, who took the stand, was trying to “eon” or “dupe” the jury. At another point during defense counsel’s summation, the prosecutor said “that’s not even close (to the evidence).” Defense counsel failed to object to these comments. Thus, appellant bears the burden of showing plain error; i.e., that the error affected his substantial rights. Olmo, supra; United, States v. Adam, 70 F.3d 776 (4th Cir.1995); United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993).
To reverse for plain error, we must: (1) identify an error; (2) which is plain; (3) which affects substantial rights; and (4) which “seriously affeet[s] the fairness, integrity or public reputation of judicial proceedings.”
Moore, 11 F.3d at 481 (quoting Olano, 507 U.S. at 736, 113 S.Ct. at 1779).
Under the evidence in this case, the prosecutor’s argument that the appellant, on trial for mail fraud, attempted to “con” the jury into believing his version of the events at issue was not plain error. “It is undisputed that closing argument is not merely a time for recitation of uncontroverted facts” and argument may rely on inferences from the evidence. Francisco, 35 F.3d at 120.
While it was improper for the prosecutor to make an exclamation during the closing argument of defense counsel, it cannot be said the remark constituted error. It would have been entirely appropriate for the prosecutor to argue during summation that the defense version of the events at issue “were not even close” to the evidence presented. Thus, the remark, while perhaps a breach of courtroom etiquette, was not error.
Moreover, the appellant has not identified the impairment of a substantial right which seriously affected the fairness and integrity of the judicial process. Moore, supra. Thus, the remarks did not constitute prosecutorial misconduct giving rise to reversible error.
III.
Appellant also claims the trial court erred in the admission of evidence pursuant to Federal Rule of Evidence 404(b) in the absence of a notice by the government that such evidence would be presented.[3] Inherent in appellant’s claim is a showing that the evidence at issue is indeed Rule 404(b) evidence.
It is well-settled that decisions regarding the admission and exclusion of evidence are peculiarly within the province of the district court, not to be reversed on appeal absent an abuse of discretion. [A]ny error in [the] admission or exclusion [of evidence] is subject to the harmless error test.
Francisco, 35 F.3d at 118 (citations omitted).
Robert Shirey testified that he and appellant co-owned Provident Capital Management. Irvin Kuhn, an alleged victim, testified that he invested funds with Provident Capital Management in late 1992 and early 1993. J.A. at 76-78, 83-87. Appellant objected to this evidence, claiming that Kuhn actually gave the investments to Shirey who invested them in Provident Capital Management, a company in which appellant had no ownership. In addition, appellant argued the *-1312 time frame of these investments was outside the scope of the indictment. Thus, appellant claims this testimony amounted to improper use of Rule 404(b) evidence to show a propensity to commit mail fraud.
However, the indictment alleged the scheme continued from March 1989 through December 1993. It also alleged, and the evidence at trial showed, that Loayza and Shirey co-owned Provident Capital Management. The last date in the indictment when appellant was alleged to have used the mail was March 1992. However, his participation in the scheme with Shirey later that year was simply direct evidence of the scheme to defraud, not Rule 404(b) evidence.
It is well-established, however, that the mere fact that the evidence involved activities occurring [after] the charged time frame of the [offense] does not automatically transform that evidence into “other crimes” evidence_ “There is no requirement that all the Government’s evidence fall within the time period of the indictment, providing it is relevant to the charges.” Rather, evidence of uncharged conduct is not considered “other crimes” evidence if it “arose out of the same ... series of transactions as the charged offense, ... or if it is necessary to complete the story of the crime (on) trial.”
United States v. Kennedy, 32 F.3d 876, 885 (4th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995) (citations omitted); United States v. Dozie, 27 F.3d 95, 97 (4th Cir.1994) (evidence concerning fraudulent conduct occurring within the time frame of the conspiracy to defraud admissible to prove involvement in the scheme, not to prove similar acts).
IV.
At trial, the government used summary charts of bank records which were introduced after the testimony of thirteen prosecution witnesses occurring over a three day period. Among the 130 government exhibits admitted during this time were the complete bank records of all the companies used by Loayza and Shirey to instigate and perpetuate the fraudulent scheme. Appellant’s only argument against the admission of the summary charts is that they “unduly showe[d] the evidence. The jury should be making their judgment from the original records.” Appellant’s Br. at 29.
The admission of summary charts “will not be overturned on appeal unless [the] decision is shown to be arbitrary or irrational.” United States v. Johnson, 54 F.3d 1150, 1156 (4th Cir.), cert. denied, — U.S. —, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995). Summary charts are admissible if they aid the jury in ascertaining the truth. Id., at 1159. The complexity and length of the ease as well as the numbers of witnesses and exhibits are considered in making that determination. Id. While the potential prejudice to a defendant must be considered, prejudice may be dispelled by giving the defendant an opportunity to cross-examine the individual who prepared the chart. Id. In addition, a cautionary jury instruction may be requested and given. Id.
The court below applied these factors. It elicited from defense counsel that he had pretrial access to the original documents from which the summary charts were prepared. J.A. at 215. Counsel also had the benefit of the charts themselves prior to trial and an opportunity to cross-examine the testifying agent. Id.; Johnson, supra.
In addition, the trial court gave the jury a cautionary instruction regarding the use of the charts. Appellant claims this instruction was erroneous because it “invited” the jury to “accept the checks as genuine because they were on the chart.” Appellant’s Br. at 31. In fact, the trial court laboriously reviewed this instruction with both counsel and included language designed to answer appellant’s concern. (“Charts and summaries are only as good as the underlying evidence that supports them.” J.A at 351.) Moreover, counsel accepted and agreed to this instruction. J.A. at 280. Viewing the instruction as a whole, it clearly “informed the jury that the chart represented the Government’s analysis, and the jurors must weigh the evidence and determine the witnesses’ credibility on their own.” Johnson, 54 F.3d at 1161. “Without evidence to the contrary, we follow the presumption that the jury obeyed the limiting instructions.” Id.
*-1311 V.
Appellant claims there is insufficient evidence to sustain his convictions of Counts Four and Five because there was no evidence to show he caused the mailings involved in those counts. According to appellant, the evidence failed to show that Mrs. Vaillancourt, one of the victims, told him she had investments in the Keystone Fund. Thus, there was no showing that he knew the mail would be used.
In reviewing the sufficiency of the evidence to support [appellant’s] conviction, this court must view the circumstantial and direct evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir.1995), cert. denied, — U.S. —, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996).
Mrs. Vaillancourt testified that in 1991 the appellant and Shirey visited her at her home because they wanted her to invest in their company, Salomon Roberts Company. J.A. at 49. As a result, she withdrew money from the Keystone Fund and a check in the amount of $20,000 was made payable to her from that fund and mailed to her. Id., at 51-52. She then endorsed that check to appellant. Id. Appellant claims her testimony failed to establish that he knew the Keystone Fund would use the mail for the transactions.
However, the mail fraud statute does not require such knowledge.
The question is whether the jury could have reasonably concluded that the mailings were for the purpose of executing the scheme.... The mails were “used prior to, and as one step toward, the receipt of the fruits of the fraud.” ... “Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended then he ‘causes’ the mails to be used.”
United States v. Snowden, 770 F.2d 393, 397 (1985) (citations omitted); see also, Schmuck v. United States, 489 U.S. 705, 710-11, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989) (“It is sufficient for the mailing to be ‘incident to an essential part of the scheme,’ or ‘a step in [the] plot’”); United States v. Maze, 414 U.S. 395, 400, 94 S.Ct. 645, 648-49, 38 L.Ed.2d 603 (1974). A reasonable jury could have found that appellant’s solicitation of Mrs. Vaillancourt’s investment was done with knowledge that use of the mails would follow in the ordinary course. Thus, the evidence was sufficient to support the convictions in Counts Four and Five.
VL
Finally, appellant claims the sentencing court committed error in the computation of loss. The circuit reviews “de novo the district court’s legal interpretation of the term ‘loss’ under the Sentencing Guidelines, but ‘to the extent that the determination of the amount of loss is a factual matter, we review only for clear error.’ ” United States v. Castner, 50 F.3d 1267, 1274 (4th Cir.1995). Only a preponderance of the evidence need support these factual findings. United States v. Engleman, 916 F.2d 182, 184 (4th Cir.1990).
In calculating the total amount of loss attributable to appellant, the sentencing court included the “interest” payments made to the early investors. The evidence at trial showed that appellant and Shirey made such periodic payments to dispel investors’ complaints and to keep the scheme active. However, the funds used for those payments came from defrauding other investors. Appellant argues the amount of loss attributed to him should have been reduced by these sums which totalled approximately $96,000.
“Loss” is defined as “the value of the property taken, damaged, or destroyed.” U.S.S.G. § 2F1.1, comment (n.7) (1994); U.S.S.G. § 2B1.1, comment (n.2) (1994). “[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.” U.S.S.G. § 2F1.1, supra. It does not appear this Circuit has addressed the application of these definitions to the issue at hand. Both parties note the Seventh Circuit has addressed the point in a ease involving an almost identical scheme. Unit *-1310 ed States v. Holiusa, 13 F.3d 1043 (7th Cir. 1994). There, the defendant solicited over $11,000,000 for investment in fraudulent companies. Because of complaints from the early investors, over $8,000,000 in payments were returned to them before the scheme was uncovered. The sentencing court charged the defendant with the full amount of $11,000,000; but, on appeal, the Circuit reversed holding that only the “net” loss should be charged. See e.g., United States v. Menichino, 989 F.2d 438, 441-42 (11th Cir. 1993); United States v. Smith, 951 F.2d 1164, 1168 (10th Cir.1991); United States v. Kopp, 951 F.2d 521, 534-35 (3d Cir.1991); but see, United States v. Orton, 73 F.3d 331, 334 (11th Cir.1996) (invoking a case-by-case approach).
The government, however, encourages us to adopt the approach of the dissent in Holi-usa which noted that at the time the defendant was engaged in the fraudulent conduct, he clearly intended to receive the full amount. Thus, the definition of “loss” provided in the Guidelines resolves the issue. “This process of partial return was an essential part of [the defendant’s] ‘Ponzi’ scheme, and any comparison to a legitimate pledge or security is unfounded.” Holiusa, 13 F.3d at 1048-49 (footnote omitted) (Manion, J., dissenting).
The Second Circuit has declined to adopt a “net” loss theory. In dealing with a Ponzi scheme, that court held:
Under section 2F1.1, loss does not always equal the actual financial harm suffered by the victim. Where the “intended” loss is greater than the “actual loss”, intended loss will be used. U.S.S.G. § 2F1.1 Application Note 7. “Under the Guidelines, ‘loss’ includes the value of all property taken, even though all or part of it was returned.” Applying these principles, [defendant’s] sentence was properly enhanced. Although he returned some of [one victim’s] money, and repaid [two other victims], he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for [the first victim’s] benefit.
United States v. Mucciante, 21 F.3d 1228, 1238 (2d Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994) (citations omitted).
Here, the trial court also found the appellant never intended his victims should ultimately keep the sums paid as “interest”.
[T]he defendant, without question, participated in a scheme where a total of $643,-575.14 was taken. However, during the course of the preparation of the scheme, around $98,000 was returned to the defrauded investors clearly for the purpose of continuing to defraud them, to perpetrate the scheme. So it was not returned out of any good faith change of mind or any concern about restoring something to the victims, but merely to perpetrate the scheme.... It just does not appear to the court that this defendant ought to be able to profit from monies that just happened to be back in the victim’s hand while he was perpetrating the scheme because he never had any intent for them to keep the money. It was all designed so that he could continue to steal money from his victims.
J.A. at 404-05. Thus, the sentencing court found the appellant intended the total amount to be defrauded. This approach which holds a defendant responsible for the amount of loss which was intended, not the actual loss ultimately sustained, is appropriate in cases where the payments are vital to the longevity of the scheme. Thus in such factual scenarios, this court will decline to follow the approach of “net loss” and will hold defendants responsible for the value of all property taken, even though all or a part is returned. Where the “intended loss” is greater than the “actual loss,” the intended loss should be used.
Finally, in appellant’s case, giving him credit for the $96,000 of “interest” payments does not change the calculation of his offense level. Even if the payments are deducted from the total amount defrauded, the loss exceeds $500,000 and a 10-level increase in offense level is warranted. U.S.S.G. § 2Fl.l(b)(l)(K).

*-1309
CONCLUSION

The court has reviewed appellant’s other contentions and finds them to be without merit. For the reasons set forth herein, the judgment of the district court is hereby

AFFIRMED.

. A "Ponzi” scheme typically refers to one in which early investors are paid off with money received from later investors in order to prevent discovery and to encourage additional and larger investments. It is named for the alleged 1920’s swindler, Charles A. Ponzi.

. The court charged the jury as follows:
Ladies and gentlemen, I caution you here at this point that during the course of closing argument both counsel perhaps from time to time used the phrase "I believe" or "I think,” or this or that in referring to the evidence. *-1313 That is not evidence. What counsel believes or thinks doesn’t matter. It is what you believe and what you find to be the evidence. You are the judges of the facts. So I caution you of that.
J.A. at 334.

. Rule 404(b) provides in pertinent part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, ... of the general nature of any such evidence it intends to introduce at trial.